IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SUSTAINABLE MODULAR MANAGEMENT, INC., | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:20-CV-1883-D |
| VS. | § § | |
| THE TRAVELERS LLOYDS INSURANCE COMPANY | § § § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff Sustainable Modular Management, Inc. ("SMM") sues defendant The Travelers Lloyds Insurance Company ("Travelers") to recover on contractual and extracontractual claims arising from Travelers' denial of coverage under a builders' risk policy for mold and moisture damage to a modular building that SMM constructed in Hawaii. Travelers moves for summary judgment, relying principally on policy exclusions. For the following reasons, the court grants the motion in part and denies it in part.

I

At issue is a Travelers commercial inland marine insurance policy, Policy Number QT-660-2F253322-TLC-16 ("Policy"), that provided first party property coverage under a Construction Pak-Builders' Risk Coverage Form for two modular buildings that SMM

constructed in Honolulu, Hawaii.[1]  Under the Policy, Travelers agreed to pay "for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss."  D. App. (ECF No. 66-1) at 31.

SMM installed the building at issue (the "Building")[2] under a subcontract with AECOM Technical Services, Inc. ("AECOM").   Under the terms of the subcontract, AECOM was responsible for readying the building site, including site grading, and SMM was responsible for fabricating and installing the Building.  The Building itself is comprised of 18 separate modular sections joined at "matelines" to form a single structure measuring approximately 220 feet long and 60 feet wide.  The Building is installed on a pier foundation, leaving approximately three feet of enclosed crawl space between the ground and the underside of the building.

SMM completed construction by May 2017 and turned the Building over to AECOM and the U.S. Government.  Several months later, elevated moisture levels and visible mold growth were observed inside the Building's walls.  Removal of the drywall revealed moisture and mold damage inside the walls in the proximity of the matelines.  The mold and moisture damage was centered at the floor and went up the wall about halfway, but did not reach to

---

[1]In recounting the factual background, the court summarizes the evidence in the light most favorable to SMM as the summary judgment nonmovant and draws all reasonable inferences in its favor.  *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.).

[2]The Building is a forensic toxicology and drug testing lab.  It is undisputed that the Building constitutes "Covered Property" under the Policy.

the ceiling.

AECOM hired Environmental Risk Analysis, LLC ("ERA") to conduct a mold and moisture assessment of the Building.  In an August 25, 2017 report ("First ERA Report"), ERA concluded:

> ERA believes elevated moisture is due to condensation from inadequate insulation on the floor of the trailers at the mate lines, combined with high humidity and moisture observed in the soil beneath Building 160.  Sealing the gaps in the floor of the office and addressing the elevated moisture observed in soil under the building is recommended to prevent a recurrence.

*Id*. at 384.

Todd Welch ("Welch"), the SMM Superintendent who oversaw installation of the Building, assisted in remediating the damage in September 2017.  Welch oversaw replacement of the damaged interior drywall and the sealing of any small voids at the floor matelines with a foam sealing spray.  For its part, AECOM hired a roofing contractor—MRC Roofing ("MRC")—to perform patch repairs on the roof, including patching cuts and holes in the roof membrane and striping in roof penetrations created for exhaust fans, pipe boots, and ducts.  The entire remediation process— drywall replacement, floor mateline sealing, and roof repair—was complete by October 16, 2017.

In early September 2017 SMM notified Travelers of the loss and sought coverage under the Policy.  Travelers assigned Eric Lee ("Lee"), an independent adjuster who worked for VeriClaim, Inc. ("VeriClaim"), to inspect the Building.  During the inspection on September 21, 2017, Lee took photographs of the interior of the Building (where the drywall

had been removed) and took numerous photographs of the patchwork repair that MRC had performed on the roof.  According to Travelers, Welch indicated to Lee that it was the prevailing belief that the water intrusion was from the crawl space under the Building.

Following a heavy rainfall, water was observed on October 23, 2017 coming from the bottom of the walls, and "ponding" on the tile surface was seen in several areas of the Building.  After the rain event, ERA performed another assessment.  In a November 3, 2017 report ("Second ERA Report"), it concluded: "ERA believes elevated moisture was due to intrusion through the roofing materials."  *Id*. at 542.  The entire roof was then covered with a white hydrostop coating, and leaks ceased to be a problem.

On December 6, 2017 Jim Floyd ("Floyd") inspected the Building in an attempt to determine the cause of the water intrusion and mold growth.  Floyd worked for The Vertex Companies, Inc. ("Vertex"), a third-party consulting firm whom Travelers retained.  Vertex issued a December 20, 2017 report ("First Vertex Report") in which it concluded that deficient site grading, coupled with the lack of ventilation in the skirting that enclosed the crawl space, caused the water intrusion.  The First Vertex Report noted that Vertex "did not observe evidence indicating that the reported excessive moisture and microbial growth was attributable to roof leaks."  *Id.* at 394.

Based on the First Vertex Report, Travelers concluded that the damage to the Building had been caused by surface water and defective construction, neither of which was a covered cause of loss under the Policy.  In January 2018 Adam McClure ("McClure"), the Travelers adjuster assigned to SMM's claim, contacted Nick Mackie ("Mackie"), SMM's CEO, to

inform him of the findings in the First Vertex Report and to explain that Travelers would not reimburse SMM for the repair costs. SMM maintains that, during their conversation, McClure suggested to Mackie that SMM use the First Vertex Report to seek reimbursement for the repair work from AECOM.

In January 2018 SMM made demand on AECOM for, *inter alia*, reimbursement of the expenses it had incurred addressing the water and mold damage. SMM included a copy of the First Vertex Report and asserted that the water intrusion was the result of improper drainage and the lack of a moisture barrier in the crawl space. AECOM rejected SMM's demand and asserted that SMM's defective work had led to the moisture intrusion. AECOM noted information related to leaks in the roof, including roof penetrations around ductwork that were improperly sealed. AECOM also criticized Vertex's conclusion that the water intrusion did not come from the roof, and it noted that, even under the First Vertex Report, if moisture was coming from the crawl space, Vertex had pointed to a lack of proper venting as a contributing cause. AECOM asserted that SMM owed it for costs it had incurred as a result of SMM's defective work, relying on the First and Second ERA Reports to explain why the moisture intrusion was SMM's responsibility. SMM replied that any roof leaks were caused by AECOM and its subcontractors, who had performed maintenance or other work on the roof, and that site grading was the cause of the mold and moisture in the walls.

On April 30, 2018 Premier Restoration, a remediation company whom SMM had hired to address the mold and moisture damage, sued SMM in the United States District Court for the District of Hawaii ("Hawaii Litigation") seeking payment for work it had

performed at the Building. SMM filed a third-party complaint against AECOM, alleging that the water intrusion was caused by AECOM's inadequate site preparation and the lack of a vapor barrier under the Building. AECOM counterclaimed against SMM, asserting that the moisture intrusion was due to SMM's work, including inadequate insulation of the trailers at the matelines, inadequate ventilation of the skirting around the crawl space, and deficiencies in the roof and matelines.

In June 2018 Travelers denied SMM's claim under the Policy in writing. The denial letter relied heavily on the First Vertex Report and concluded, in pertinent part:

> The loss location in question falls under the Flood Zone A and a review of your Declaration page indicates that flood coverage was not selected for this specific flood zone. Additionally, the above referenced Builders' Risk policy is not intended to provide coverage for any portion of the construction that is as a result of faulty planning or inadequate materials used in construction. Based off of the VERTEX engineering inspection report and the applicable Builders Risk policy language detailed above, we will be unable to provide coverage for the damages presented to the [Building].

P. App. (ECF No. 70-1) at 176.

In April 2019 SMM requested that Travelers reconsider coverage for loss in light of "new information" discovered in connection with the Hawaii Litigation. Travelers forwarded SMM's materials to Vertex and asked it to consider whether any of the new information impacted Vertex's opinions. On September 25, 2019 Vertex issued a supplemental report ("Supplemental Vertex Report") concluding that "the damage to the interiors of Building 160 was most likely due to water intrusion originating at the roof mate-lines and various roof

penetrations."  D. App. (ECF No. 66-1) at 660-61.  After SMM received the Supplemental

Vertex Report, it settled the Hawaii Litigation with AECOM.

In early 2020, Travelers again denied SMM's claim under the Policy.  It explained,

in an April 28, 2020 letter:

> In [the Supplemental Vertex Report], Vertex identified that the
> interior damage was due to water intrusion originating at the
> roof mate-lines and various roof penetrations, which then
> followed a path along the modular box framing and that came to
> rest at the floor level of the boxes.  Our investigation revealed
> that the exterior of the building did not sustain any initial
> damage from a Covered Cause of Loss that allowed the water to
> enter.  Additionally, the above referenced Builders' Risk policy
> does not cover damage from mold or fungus that does not result
> from a "specified cause[] of loss[."]  In this case, there was no
> "specified cause of loss."  Therefore, we will be unable to
> provide coverage under this policy for your claim.

P. App. (ECF No. 70-1) at 200.

SMM then filed the instant lawsuit against Travelers in Texas state court.  Travelers

removed the case to this court based on diversity jurisdiction.  In its amended complaint,

which is its operative pleading, SMM alleges claims for breach of contract, violation of Tex.

Ins. Code Ann. § 541.060(a)(7) (West 2019), violation of Tex. Ins. Code Ann. § 541.061(1)-

(3) (West 2019), common law fraud, fraudulent concealment, and negligent

misrepresentation.  Travelers moves for summary judgment on all of SMM's claims.[3]  SMM

opposes Travelers' motion.  The court is deciding the motion on the briefs.

---

[3]Also pending is Travelers' motion to exclude the expert testimony of Stephen S.
Collins.  This motion is being decided in a separate memorandum opinion and order filed
today.

II

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party does so, the nonmovant must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if the nonmovant fails to meet its burden.  *Little*, 37 F.3d at 1076.

For claims on which the moving party will bear the burden of proof at trial, to be entitled to summary judgment the movant "must establish 'beyond peradventure all of the essential elements of the claim[.]'"  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the movant must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law.  *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).

"The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

## III

The court begins with SMM's breach of contract claim. Under Texas law,[4] a party seeking to recover for breach of an insurance contract bears the initial "burden of establishing coverage under the terms of the policy." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (citation omitted); *see also Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 468 (Tex. App. 2015, pet. denied) ("[I]n the context of an insurance policy, a plaintiff must prove the existence of a valid insurance policy covering the denied claim and entitlement to money damages on that claim." (citation omitted)). Once general coverage is established, the burden then shifts to the insurer to show that an exclusion applies and negates coverage. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015) (quoting *Gilbert*, 327 S.W.3d at 124). "Exclusions are narrowly construed, and all reasonable inferences must be drawn in the insured's favor." *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 370 (5th Cir. 2008) (citation

---

[4]Under the Texas Insurance Code, "[a]ny contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby." Tex. Ins. Code Ann. art. 21.42 (West 2009). Accordingly, Texas law applies to this insurance dispute.

omitted).  "If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Gilbert*, 327 S.W.3d at 124 (citations omitted).

The Policy is an "all risk" policy that provides coverage for all losses "caused by or resulting from a Covered Cause of Loss."  D. App. (ECF No. 66-1) at 31.  A "Covered Cause of Loss" includes all "risks of direct physical loss unless the loss is excluded in Section B - Exclusions."  *Id.* at 32 (capitalization omitted).  Travelers maintains that the loss at issue—i.e., the moisture damage to the walls of the Building—is excluded under one or more of the following Policy exclusions: the water damage exclusion; the defective workmanship, construction, and maintenance exclusion; the rain exclusion; and the fungus exclusion.  The court will consider each of these exclusions in turn.  Because Travelers will bear the burden of proof at trial with respect to the Policy exclusions, to be entitled to summary judgment it must establish beyond peradventure that the exclusion in question applies.

IV

Travelers moves for summary judgment on SMM's breach of contract claim on the ground that the Policy excludes coverage for each of the four possible theories of causation of the moisture damage in the walls—(1) humidity from the crawl space rose into the walls after improper site grading allowed water to pool and pond under the trailer, (2) rainwater entered through the roof matelines, (3) rainwater entered through roof penetrations created by subcontractors stepping on sheet metal screws, or (4) rainwater entered through improper flashing of penetrations like ducting of vents.  Because SMM does not appear to dispute that

the Policy excludes coverage for several of these potential causes of loss, the court grants Travelers' motion in part as follows.

## A

To the extent that the mold and moisture in the walls was caused by humidity and moisture wicking up from surface water in the crawl space under the Building, the court holds that the water damage exclusion ("Exclusion B.1.g") precludes coverage, regardless of any other sources that may also have contributed to the loss.

Exclusion B.1.g provides, in pertinent part:

> We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area. . . .
>
> g.    Water
> (1)    Any of the following, all whether naturally occurring or due to man-made or other artificial causes:
> > (a)    Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these, all whether driven by wind (including storm surge) or not[.]

D. App. (ECF No. 66-1) at 39-40 (bold font omitted).

In support of its motion, Travelers argues, *inter alia*, that "surface water" in the insurance context has long been defined in Texas as water or natural precipitation diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches channels where water naturally flows; that rainwater or storm water moving across the

surface of the ground and becoming trapped under the building falls within the definition of "surface water"; that the water exclusion applies if surface water directly or indirectly caused the damage and, in this case, SMM's expert conceded that if the intrusion came from the ground up, water would have "contributed to the damage," D. Br. 17 (quoting D. App. (ECF No. 66-1) at 732, 745); that under the Policy's anti-concurrent causation clause, if the surface water was a contributing cause of the mold and moisture damage, there is no coverage for this damage regardless of any other cause or event that contributed to it; and that, in sum, the evidence establishes that surface water at least partially caused and contributed to the mold and moisture damage and even if other causes or events contributed concurrently or in any sequence with the surface water, no coverage is afforded for the claim because of the water exclusion and its anti-concurrent causation clause.

Contending that the mold and water damage was caused by damage to the roof, not by surface water, SMM responds that there is a genuine issue of material fact that precludes application of the water exclusion. But SMM does not dispute that, if the damage *was* caused by surface water under the building wicking up through the crawl space, Exclusion B.1.g would apply. Nor does it contest that, if Travelers succeeds in proving that surface water under the Building either caused or contributed to the mold and moisture damage at issue, then Travelers "is exempt from liability for all damages caused directly or indirectly by the excluded cause, *i.e.*, [surface water], regardless of any other cause or event contributing concurrently or in any sequence to the loss." *Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 2002 WL 356756, at *4 (N.D. Tex. Mar. 5, 2002)

(Fitzwater, J.); *see also JAW The Pointe, L.L.C.*, 460 S.W.3d at 608 (under policy with anti-concurrent causation clause, "if the covered wind damage and the excluded flood damage contributed to cause the [loss], then the policy excludes coverage."). Accordingly, the court holds as a matter of law that Exclusion B.1.g precludes coverage to the extent that Travelers is able to prove at trial that surface water in the crawl space caused or contributed to the mold and water damage that is the subject of SMM's claim.

B

In the alternative, the court holds that the defective workmanship, construction, and maintenance exclusion ("Exclusion B.4") precludes coverage to the extent that Travelers can prove at trial that the damage resulted from moisture coming from below the Building.

Exclusion B.4 provides, in pertinent part:

> 4. We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective:
>> a.     Planning, zoning, development, surveying, siting;
>> b.     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;
>> c.     Materials used in repair, construction, renovation, remodeling, grading or compaction; or
>> d.     Maintenance;
>
> of part or all of any property on or off the job site described in the Declarations.

D. App. (ECF No. 66-1) at 41.

Travelers contends that, if the source of the water infiltration and mold in the walls was humidity and moisture from the crawl space, the damage is also excluded from coverage by the "defective workmanship, construction and maintenance exclusion." D. Br. 19. It

- 13 -

maintains that Mackie testified that the moisture coming from below the Building resulted from improper drainage and the lack of a moisture barrier; that a properly constructed building pad would not have allowed water to pool under the Building and would have included a vapor barrier, given these site conditions; that the moisture infiltration from under the Building was the result of faulty, inadequate, or defective siting, design, workmanship, construction, or grading; and that the defective construction exclusion therefore precludes coverage for the moisture coming from the crawl space.

SMM does not respond to this argument.  Accordingly, the court holds in the alternative that, to the extent that Travelers is able to prove at trial that moisture in the crawl space caused or contributed to the mold and water damage that is the subject of SMM's claim, Exclusion B.4 would preclude coverage.

C

Travelers contends that Exclusion B.4 precludes coverage to the extent that water or moisture infiltrated the Building through the roof.  It maintains, *inter alia*, that there are three potential sources of water infiltration through the roof—(1) penetrations through the roof caused by subcontractors of AECOM stepping on sheet metal screws, (2) improper flashing around ducting or vent penetrations through the roof, and (3) the roof matelines[5]—and that

---

[5]Travelers argues that if water entered through the roof matelines, it was because of: a failure by AECOM to properly maintain the matelines, construction-related foot traffic by AECOM and its subcontractors without adequate roof protection and stepping on sheet metal screws or dragging things across the matelines, or settlement of the building due to improper site preparation.

all three sources of water infiltration, even if caused by work conducted at the direction of AECOM, are excluded under Exclusion B.4; that to the extent the moisture intrusion came through roof penetrations created by AECOM and its subcontractors, or because of AECOM's failure to maintain the matelines, or because of AECOM's construction activities on the roof that damaged the matelines, this damage was caused by faulty, inadequate, or defective workmanship, repair, construction, or maintenance and is thus excluded under Exclusion B.4; that the resulting or ensuing loss provision in Exclusion B.4 does not reinstate coverage because the language in the exclusion requires that there be a separate cause of loss that is itself a covered cause of loss, and rain infiltrating through the penetrations (even if a separate event) would not result in coverage because interior damage due to rain is excluded under the Policy; that to the extent damage to the roof matelines was caused by the Building's shifting or settling, the evidence shows that foundation movement was due to improper site preparation, which constitutes defective construction and is excluded under the Policy; that the Policy excludes coverage for damage caused by, or resulting from, "[s]ettling, cracking, shrinking or expanding of walls, floors, ceilings, foundations, pilings, patios, driveways or pavements," D. App. (ECF No. 66-1) at 41, and damage to the matelines due to settling would therefore be excluded under Exclusion 3.b.3; and that, to the extent shifting or settling of the Building caused leaks at the matelines, coverage would be excluded for any damage from such leakage.

SMM argues in response that the Building's roof was damaged as a result negligence: foot traffic and contractors stepping on construction materials after the Building was

- 15 -

completely constructed.  SMM does not dispute, however, that, to the extent moisture and mold damage to the interior walls was caused by water infiltrating the Building through improper flashing around ducting or vent penetrations through the roof, or through roof matelines that were damaged as a result of the Building's foundation shifting or settling, coverage would be excluded under Exclusion B.4 or Exclusion 3.b.3.[6]  Accordingly, the court holds that, to the extent Travelers is able to prove at trial that the mold and water damage was caused, directly or indirectly, by water infiltrating the Building through improper flashing around ducting or vent penetrations or through roof matelines that were damaged as a result of the Building's foundation shifting or settling, coverage is excluded under Exclusion B.4 or Exclusion 3.b.3.

V

The court now turns to what appears to be the primary coverage dispute: whether the Policy excludes coverage under Exclusion B.4 if, as SMM contends, the mold and moisture damage resulted from water infiltrating the Building through penetrations through the roof

---

[6]Exclusion 3.b.3 provides, in pertinent part:

> We will not pay for loss or damage caused by or resulting from any of the following.  But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage. . . .
>
> b.  Other Types of Losses . . .
> (3)  Settling, cracking, shrinking or expanding of walls, floors, ceilings, foundations, pilings, patios, driveways or pavements.

D. App. (ECF No. 66-1) at 41 (bold font omitted).

- 16 -

caused by foot traffic over nails, screws, and other construction materials scattered over the surface of the roof after construction of the Building was complete.

## A

As stated above, Exclusion B.4 provides, in pertinent part:

> 4.  We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective: . . .
> b.      Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction; [or] . . .
> d.      Maintenance;
> of part or all of any property on or off the job site described in the Declarations.
>
> If an excluded cause of loss listed in Paragraph 4.a through 4.d above, results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss. But we will not pay for:
> (1)      Any cost of correcting or making good the fault, inadequacy or defect itself, including any cost incurred to tear down, tear out, repair or replace any part of any property to correct the fault, inadequacy or defect; or
> (2)      Any resulting loss or damage to the property that has the fault, inadequacy or defect until the fault, inadequacy or defect is corrected.

D. App. (ECF No. 66-1) at 41.

## B

To understand how Exclusion B.4 applies in this case, it is helpful to review how courts have historically interpreted "faulty workmanship" exclusions in the context of losses caused by negligence during the construction process.

*U.S. Industries, Inc. v. Aetna Casualty & Surety Co.*, 690 F.2d 459 (5th Cir. 1982),

a Fifth Circuit decision, involved a policy that, like the Policy here, protected against "all risks of physical loss or damage" to the covered property, but the policy excluded, *inter alia*, loss or damage "caused by or resulting from . . . faulty workmanship." *Id.* at 460. The insured sought to recover the cost of replacing a giant steel tower that became deformed during construction as a result of "misjudgments and even negligence on the part of [the insured]'s employees." *Id.* at 461. The district court denied coverage, holding that the damage was excluded under the faulty workmanship exclusion, and the Fifth Circuit affirmed.

The Fifth Circuit began by examining "the meaning and apparent intent of the 'faulty workmanship' exclusion in a builder's all risks policy." *Id.* at 462.

> A defect in workmanship is a defect in the way some part of the (insured property) is constructed[.] [T]he clause excludes coverage for damages resulting from defects in the product caused by faults in the construction process. . . . It is the quality of the product which is excluded from coverage, and not damage to the product caused by negligence during the construction process.

*Id.* (internal quotation marks and citations omitted). The panel then noted that

> fortuitous damage to construction property extraneous to the construction of the product itself (here, the tower), occasioned by negligence of the insured's employees, is not excluded from coverage by the "faulty workmanship" clause in an all risks policy—such as, for example, if one of the insured's employees negligently ran a truck into the tower under construction and caused it to turn over.

*Id.* But because "the defective workmanship in the stress-relieving process (whether due to negligence, inadvertence, misjudgment, or whatnot) that caused the tower to become

deformed . . . occurred during and before the completion of the tower as an integral part of the (faulty) workmanship in its construction," the panel held that the exclusion applied. *Id.* at 462-63.

In *Alton Ochsner Medical Foundation v. Allendale Mutual Insurance Co.*, 219 F.3d 501 (5th Cir. 2000), the Fifth Circuit relied again on the distinction between "the *quality of the product*" and "damage *to* the product" to determine whether the "faulty workmanship" exclusion in a builder's all-risk policy applied. *Id.* at 506. At issue, *inter alia*, was a dispute over whether cracks in the building's pile caps were excluded from coverage. The district court granted summary judgment in favor of the insurer, concluding that the loss fell within the policy's exclusion for "faulty workmanship, material, construction, or design from any cause." *Id.* at 504. The Fifth Circuit affirmed. Relying largely on the reasoning of *U.S. Industries*, it explained:

> [i]t is the *quality of the product* which is excluded from coverage, and not damage *to* the product caused by negligence during the construction process. For example, we noted [in *U.S. Industries*] that if one of the insured's employees ran a truck into the tower during construction, knocking it over, that damage clearly would be covered by the policy. Such an accident would not bear directly on the *quality* of the product (the tower) but would cause damage *to* it. By contrast, the wrinkling of the metal skin of the tower as a result of excessive heating damaged the quality of the product itself. Likewise, in the instant case, the cracking of the pile caps is damage to the quality of the product itself; the cracking did not cause damage *to* the product.

*Id.* at 506 (first alteration in original) (footnotes and internal quotation marks omitted).[7]

Courts in other jurisdictions have similarly held that "faulty workmanship" exclusions in builder's all risk policies do not exclude claims for accidental damage to covered property caused by the builder's negligence during construction. *See, e.g.*, *1765 First Assocs., LLC v. Cont'l Cas. Co.*, 817 F.Supp.2d 374, 376 (S.D.N.Y. 2011) ("[T]he Faulty Workmanship Exclusion applies only to losses attributable to the quality of the constructed property and arising from defects in the materials or process used by the insured or its agents to construct the property, [and] does not exclude losses incurred during construction associated with" the collapse of a crane that was being used at the construction site.); *City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F.Supp.2d 663, 672 (D. Vt. 2002) ("[T]he term 'faulty workmanship' . . . encompasses 'quality of product' claims (whether due to defective materials or faults during the construction process) and not claims for accidental damage to the product caused by the builder's negligence during construction[.]" (citation

---

[7]In *Axis Surplus Insurance Co. v. Mercer*, 2021 WL 6135324 (N.D. Tex. Dec. 29, 2021) (Scholer, J.), Judge Scholer recently reached a similar conclusion. There, the insured property was damaged when roofers who had been hired to replace the roof inadequately secured tarps over open areas and an overnight rainstorm caused water damage to the property's interior. Judge Scholer held that the water damage was excluded under several policy provisions, including the exclusion for "[f]aulty, inadequate or defective . . . workmanship." *Id.* at *3. She noted that "the meaning of faulty workmanship . . . encompasses defects in the process of construction, not just a defect in the final product itself," and held that because "the damage occurred as roofers removed the roofs to replace them," and because "[t]he removal of existing roofs is certainly an integral part of replacing a roof, as is waterproofing during construction," the "faulty workmanship" exclusion applied. *Id.* at *4.

omitted)); *City of Barre v. N.H. Ins. Co.*, 396 A.2d 121, 122-23 (Vt. 1978) (holding that damage that incurred when wooden arches blew down in a strong wind as a "result of misjudgment of the amount of temporary cable support needed" was not within exclusion for "loss caused directly or indirectly by faulty materials or faulty workmanship or error in design or latent defect" because "both the wind and the defective and insufficient guy cable were certainly external to the structure insured," and that "[i]t is the quality of the product which is excluded from coverage, and not damage to the product caused by negligence during the construction period").

Courts also appear to generally agree that faulty workmanship clauses do not exclude claims for damages caused by post-construction subcontractor negligence unrelated to the quality of any product or process. *See, e.g.*, *Lloyd's Acceptance Corp. v. Affiliated FM Ins. Co.*, 2013 WL 5101938, at *4-5 (E.D. Mo. Sept. 12, 2013) (holding that policy exclusion for "[d]efects in materials, faulty workmanship, faulty construction or faulty design" applies only to "construction defects and does not apply to the negligent repair or maintenance of completed projects."); *Federated Dep't Stores, Inc. v. M.J. Clark, Inc.*, 2007 WL 2088581, at *5 (N.D. Ill. July 17, 2007) ("The plain language of the exclusion for '[e]rrors in design, faulty workmanship or use of faulty materials . . .' is that the policy excludes damages caused by faulty materials or faulty installation of the pipes, rather than subcontractor negligence in the repair or maintenance of the pipe." (ellipsis in original)); *Otis Elevator Co. v. Factory Mut. Ins. Co.*, 353 F.Supp.2d 274, 281 (D. Conn. 2005) (holding that "faulty workmanship" exclusion did not apply to damage caused by subcontractor negligence in testing tram

because "[t]he accidental property damage to the tram . . . is simply accidental damage resulting from subcontractor negligence unrelated to the quality of any product or process.").

In sum, as the Fifth Circuit observed in *Alton Ochsner Medical Foundation*, "[a]ll-risk insurance policies generally are viewed as limiting recovery to those losses in which the cause is 'external to the structure insured,' as opposed to an 'internal' or 'inherent' defect in the item of property which is damaged." *Alton Ochsner Med. Found.*, 219 F.3d at 507 (citation and some internal quotation marks omitted).

## C

Based on the summary judgment record, the court holds that a reasonable jury could find that the cause of the loss was external to both the Building itself and to the process of constructing, maintaining, or repairing it.

A reasonable jury could find that the damage that is the subject of SMM's claim (i.e., the moisture and mold damage) was caused by the post-construction negligence of trades and workers stepping on construction materials scattered over on the roof.  For example,[8] Welch testified at his deposition that, by the time the Building was finished and was turned over to the customer, the roof was "nice, clean, [and in] good shape."  P. App. (ECF No. 70-1) at 78. He opined that

---

[8]"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact."  *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

> [t]he water [in]trusion . . . appeared to be caused by abundance of nails, screws, and other construction materials scattered over the surface of the roof coupled with excessive foot traffic.  As time progressed, foot traffic caused the nails and screws to penetrate the surface of the roof and disrupted the mate lines, thus resulting in water intrusion through the roof.

*Id.* at 80.

A reasonable jury might also find from the summary judgment evidence that the "foot traffic" that over time caused the nails and screws to penetrate the surface of the roof was "external" or "extraneous" to the process of constructing, maintaining, or repairing the Building.  This is because it is unclear from the record whose "foot traffic" damaged the roof, why there were construction materials scattered over the roof, or why various trades and workers were on the roof.  For example, Welch testified that "just anybody" could have caused the damage to the Building's roof

> if they were going on the roof all the time, like the military people—you know, people I didn't know, but they would go up there all the time, so I don't know.  And like I said, if they're not aware of rubber roofs, especially mate lines, and they had anything that you may not be—be able to feel on your foot, you're just going to—just hole it up, and then they never even be the wiser, you know.

*Id.* at 75.

Travelers contends that, "to the extent moisture intrusion came through roof penetrations created by AECOM and its subcontractors, or AECOM's failure to maintain the matelines, or AECOM's construction activities on the roof that damaged the matelines, that damage was caused by faulty, inadequate or defective workmanship, repair, construction or

- 23 -

maintenance." D. Br. 22.  But Travelers does not present any evidence, and thus has not

established beyond peradventure, that the trades and workers who allegedly caused the

damage to the Building's roof were completing tasks related to the building's construction,

maintenance, or repair.  While it is certainly possible that a reasonable jury could find that

the damage to the roof was caused by "faulty, inadequate or defective workmanship, repair,

construction or maintenance," it is also possible that a reasonable jury could find that the

"foot traffic" on the roof was external or extraneous to any repair, construction, or

maintenance of the Building.[9]

Travelers concedes in its reply that "[o]ther negligence that causes damage, that is not

part of the process of repair, construction or maintenance of the subject property, *would not

be excluded*" under Exclusion B.4.  D. Reply 5 (emphasis added).  Because it is possible that

the Building's roof was damaged by foot traffic *unrelated to* the process of constructing,

maintaining, or repairing the Building, Travelers has not established beyond peradventure

_____

[9]The two cases on which Travelers relies, *BSI Constructors, Inc. v. Hartford Fire Insurance Co.*, 705 F.3d 330 (8th Cir. 2013), and *L.F. Driscoll Co. v. American Protection Insurance Co.*, 930 F. Supp. 184 (E.D. Pa. 1996), are not binding on this court, and, even if they were, they are distinguishable on their facts.  In *BSI Constructors* there was evidence that "the subcontractors acted negligently *while completing tasks directly related to the building's construction*."  *BSI Constructors, Inc.*, 705 F.3d at 333 (emphasis added).  Similarly, in *L.F. Driscoll* the parties agreed "that the negligence of the subcontractors *during construction of the Research Center* caused damage to the roofs." *id.* at 187; *see also id.* at 188 ("As with the damage stemming from the faulty post-welding heat treatment in *U.S. Industries*, the damage to the roofs in this case occurred before the Research Center had been completed and thus constitutes 'workmanship.'").  Here, Travelers has not presented any evidence, and thus has not established beyond peradventure, that the trades and workers who allegedly caused the damage to the Building's roof were completing tasks directly related to the Building's construction, maintenance, or repair.

that the loss was caused by an "internal" or "inherent" defect in the roof of the Building or the process by which the Building was constructed, maintained, or repaired.  *See Alton Ochsner Med. Found.*, 219 F.3d at 507.  The court therefore denies Travelers' motion for summary judgment on SMM's breach of contract claim to the extent it is based on the ground that the Policy coverage is excluded under Exclusion B.4.  *See, e.g.*, *Engineered Structures, Inc. v. Travelers Prop. Cas. Co.*, 822 Fed. Appx. 606, 609 (9th Cir. 2020) (mem.) (reversing and remanding case where "[f]urther proceedings [were] necessary to resolve whether [plaintiff]'s losses were, in fact, 'caused by or result[ed] from faulty, inadequate or defective . . . construction,' thus making the Exclusion applicable." (some alterations in original)).[10]

## D

Travelers also maintains that the damage at issue is excluded under Exclusion B.2.e, which excludes loss or damage caused directly or indirectly by "[r]ain . . . unless: (a) The building or structure first sustains damage by a Covered Cause of Loss to . . . [i]ts completed exterior facing roof or walls."  D. (ECF No. 66-1) at App. 41.  Travelers contends that there was no damage to the roof as a result of a "Covered Cause of Loss, through which the rain entered," because "any 'damage' to the roof constitutes excluded faulty workmanship, construction and maintenance or was the result of settling that disrupted the matelines."  D. Br. 23.  The court declines to grant summary judgment on this basis.

Because the court is denying Travelers' motion for summary judgment on the ground

---

[10]The court suggests no view on whether Travelers will be able to prove at trial that Exclusion B.4 bars coverage.  This question will turn on the jury verdict.

that any damage to the roof is excluded under Exclusion B.4, it cannot conclude, as a matter of law, that the damage to the roof through which the rain entered was *not* caused by a "Covered Cause of Loss."  Accordingly, the court denies Travelers' motion for summary judgment on this ground.

VI

The court now turns to Travelers' contention that it is entitled to summary judgment on SMM's breach of contract claim based on Exclusion B.1.b, the fungus exclusion.

A

It is undisputed that the loss that is the subject of SMM's insurance claim was caused, in part, by "fungus," as that term is defined in the Policy.[11]  Under Exclusion B.1.b, the Policy excludes from coverage "loss or damage caused directly or indirectly by . . . [p]resence, growth, proliferation, spread or any activity of 'fungus', wet rot or dry rot."  D. App. (ECF No. 66-1) at 39.  This exclusion does not apply, however, "[t]o the extent that coverage is provided in the 'Fungus', Wet Rot And Dry Rot Additional Coverage."  *Id.*  In Paragraph A.5.f, under the heading "Additional Coverages," the Policy provides, in pertinent part:

---

[11]The Policy defines "Fungus" to mean "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi."  D. App. (ECF No. 66-1) at 48.

- 26 -

f.   "Fungus", Wet Rot And Dry Rot

(1)   We will pay for direct physical loss of or damage to Covered Property caused by "fungus", wet rot or dry rot, but only when the "fungus", wet rot or dry rot is the result of any of the "specified causes of loss", other than fire or lightning, that occurs during the policy period and only if all reasonable means were used to save and preserve the Covered Property from further damage at the time of and after the occurrence of any such cause of loss.

D. App. (ECF No. 66-1) at 35 (bold font omitted).  Relevant to SMM's claim under the

Policy, the phrase "specified causes of loss" is defined to include "water damage,"[12] and the

term "Water damage" is defined to mean, *inter alia*:

Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts) that is located on the applicable job site described in the Declarations and contains water or steam[.]

*Id.* at 49.

_____

[12]The Policy defines "Specified causes of loss" to mean:

fire; lightning; explosion; windstorm or hail; smoke (including the emission or puff back of smoke, soot, fumes or vapors from a boiler, furnace or related equipment); aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; "sinkhole collapse"; volcanic action, falling objects as limited below; weight of snow, ice or sleet; "water damage"; all only as otherwise insured against in this Coverage Part.

D. App. (ECF No. 66-1) at 49.

B

Travelers maintains that it is entitled to summary judgment because the damage at issue was caused in part by mold, so the fungus exclusion (i.e., Exclusion B.1.b) precludes coverage. According to Travelers, although certain coverage for damage caused by fungus or mold is added back to the Policy in Paragraph A.5, this additional coverage applies only if the fungus is the result of any of the "specified causes of loss"; that SMM's argument that the mold was the result of the "specified cause[] of loss" of "water damage" relies on "an enormously tortured interpretation" of the "water damage" provision, D. Br. 25; and that when the entirety of the definition of "water damage" is considered, including the specific types of systems referenced therein, it is clear that the definition applies when a system holds water, such as occurs in a plumbing system, not something that restrains or holds back water like a roof or a wall.[13]

SMM responds that the question for the court is whether the roof of the Building is a "system" that "contains water or steam"; that the word "contain" is not defined in the Policy; that a dictionary has defined "contain" to mean "restrain," "control," "check" and

---

[13]Travelers also posits that, to the extent SMM relies on an incident in May 2017 involving a finish nail from the drywall that punctured a pipe and caused a leak, SMM never submitted a claim to Travelers regarding this nail-created leak; SMM testified that it did not know whether any water from that event would have contributed to the microbial growth identified in September 2017; and that, in any event, driving a nail into a plumbing pipe while installing drywall would constitute faulty, inadequate, or defective construction, which is excluded from coverage under Exclusion B.4. SMM does not respond to this argument, and does not appear to contend that the May 2017 incident caused the damage at issue in this litigation.

"halt,"; that the roof of the Building undeniably restrained water from penetrating the interior of the Building; that the roof is therefore a "system" that "contains" water within the definition of "water damage"; and that, at the very least, SMM's interpretation of "contain" is reasonable, and therefore, the definition of "water damage" is ambiguous.  P. Br. 35.

## C

Texas courts interpret insurance policies according to the rules of contract interpretation.  *See Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("Interpretation of insurance contracts in Texas is governed by the same rules as the interpretation of other contracts.").  When a "contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law."  *Int'l Ins.*, 426 F.3d at 291; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).  "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy."  *Int'l Ins.*, 426 F.3d at 291; *see also Forbau*, 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent." (citations omitted)).  The court must give effect to all of a policy's provisions so that none is rendered meaningless.  *Int'l Ins.*, 426 F.3d at 291.  "Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered."  *Id.* (citing *Kelley-Coppedge*, 980 S.W.2d at 464).  "If an insurance contract uses unambiguous

language, [the court] must enforce it as written.  If, however, a contract is susceptible to more than one reasonable interpretation, [the court] will resolve any ambiguity in favor of coverage." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (footnotes omitted); *see also Nat'l Union Fire Ins. Co.*, 811 S.W.2d at 555.

## D

The court holds as a matter of law that the roof of the Building is not a "system" that "contains" water, as used in the Policy's definition of "water damage."  The Policy defines "Water damage" to mean, *inter alia*:

> Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts) that is located on the applicable job site described in the Declarations and contains water or steam[.]

D. App. (ECF No. 66-1) at 49.  SMM principally maintains that, because the dictionary definition of the word "contain"  includes terms such as "restrain," "control," "check," and "halt," and because the roof of the Building restrained water from penetrating the interior of the Building, the roof of the Building must therefore be a "system" that "contains" water, within the definition of "water damage."  The court disagrees.

The term "contain" is not defined in the Policy.  "As with any other contract, [the court] determine[s] the meaning of an undefined term as used in an insurance policy by applying its 'ordinary and generally accepted meaning,' as construed 'in context and in light of the rules of grammar and common usage.'"  *Pharr-San Juan-Alamo Indep. Sch. Dist. v.*

*Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 473-74 (Tex. 2022) (citations omitted). "To determine a term's common, ordinary meaning, [Texas courts] typically look first to dictionary definitions and then consider the term's usage in other authorities." *Anadarko Petroleum Corp. v. Hous. Cas. Co.*, 573 S.W.3d 187, 192 (Tex. 2019) (citing *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)). Importantly, Texas courts do not "simply stop at the dictionary definitions. . . . [C]ontext matters." *Id*. at 193. The court "cannot isolate any word, phrase, sentence, or section from its setting and construe it without considering its context." *Id*. (citing *Forbau*, 876 S.W.2d at 134).

SMM relies entirely on the online Merriam-Webster Dictionary definition of "contain" to argue that this term, as used in the Policy, means anything that restrains. But SMM disregards the secondary definition in this source, which is "to have within" or "hold." *See* contain definition, Merriam-Webster.com, *available at* https://www.merriam-webster.com/dictionary/contain (last visited June 13, 2022). It is this secondary definition that logically applies when the word "contains" is considered in context.

The Policy definition of "water damage" is limited to the accidental discharge or leakage of water or steam as the result of the breaking apart or cracking of three specifically-enumerated items (i.e., a "plumbing, heating, [or] air conditioning" system or appliance), and the catchall, "other system or appliance . . . that . . . contains water or steam." D. App. (ECF No. 66-1) at 49. "Generally, a catchall phrase should be read in light of the preceding list, an interpretive maxim known as ejusdem generis ('of the same kind')." *Silguero v. CSL*

*Plasma, Inc.*, 907 F.3d 323, 329 (5th Cir. 2018) (citing *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991)); *see also United States v. Clark*, 990 F.3d 404, 408 (5th Cir. 2021) ("When confronted with a list of specific terms that ends with a catchall phrase, courts should often limit the catchall phrase to 'things of the same general kind or class specifically mentioned.'" (citation omitted)).  Here, the items specifically mentioned all hold water or steam within their parts and are designed to use water or steam in their operation.  Under traditional rules of contract interpretation, the catchall phrase "other system or appliance . . . that . . . contains water or steam" should be similarly limited. A "roof system" does not hold water or steam within its parts, but, instead, "serves to exclude water."  *Feenix Parkside LLC v. Berkley N. Pac.*, 438 P.3d 597, 606 (Wash. App. 2019).

At least two courts interpreting identical policy language have held that the definition of "water damage" does not apply to the leakage of water through cracks in a roof.  *See id.* ("A 'roof system' is not the equivalent of a plumbing, heating, or air conditioning system, because those systems are all designed to use water or steam in their operation, while a roof system serves to exclude water.  Feenix's argument violates the rule of ejusdem generis and its offered definition of 'system' fails."); *Albrite Carpets, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2010 WL 3749457, at *2 (D. Mass. Sept. 22, 2010) ("Plaintiff appears to ask the Court to find that the water that leaked through the roof falls within that definition of 'water damage.'  A roof is not a 'system' or 'appliance' and does not 'contain' water or steam, and therefore leakage of water through cracks in the roof is not a 'specified cause of loss.'").  The court is persuaded by the reasoning in these decisions, and holds as a matter of law that the

mold at issue cannot have been caused by "water damage," as that term is defined in the Policy.

SMM does not contend that any other "specified cause of loss" caused the mold at issue in this case. Accordingly, the court concludes that, to the extent that Travelers establishes at trial that the damage, or some portion of the damage, was caused by "mold," coverage for that damage is excluded under Exclusion B.1.b.[14]

VII

Travelers contends that, even if some portion of the mold and moisture damage in the Building was caused by a Covered Cause of Loss, SMM has failed to meet its burden of segregating covered and non-covered loss.

A

Although an insured who suffers damage from both covered and excluded perils is not precluded from recovering, "[w]hen covered and excluded perils combine to cause an injury, the insured must present some evidence affording the jury a reasonable basis on which to allocate the damage." *Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 601 (Tex. 1993). Because an insured can only recover for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof. *See Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 303 (Tex. App. 1999, pet. denied). "It is essential that the insured produce evidence which will afford

---

[14]Coverage for damage to the Building caused *exclusively* by water, however, is not necessarily excluded under Exclusion B.1.b.

a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971) (citation omitted). "[F]ailure to segregate covered and noncovered perils is fatal to recovery." *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App. 2003, pet. denied); *see also Dall. Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 227 (Tex. App. 2015, no pet.) (holding there was no reasonable basis for estimating amount of damage caused by risk covered by the insurance policy).

B

Travelers moves for summary judgment on the ground that, even if some portion of the moisture damage was caused by a covered cause of loss, SMM cannot meet its burden of segregating between covered and non-covered loss. Travelers posits that SMM's CEO (Mackie) has opined that any moisture intrusion from punctures or penetrations in the roof was de minimis and that damage from moisture intrusion, such as damage to ceiling tiles, did not form the basis of the insurance claim; that SMM's site superintendent (Welch) opined that 80% of the damage inside the Building was caused by water coming from the roof [D. Br. 27]; that Welch testified that water damage along the Building's exterior would have been caused by improperly-installed caulking or window trim, and that he could not exclude that some portion of the water damage to the interior of the Building had come from loose laps in the matelines that may have been caused by improper installation; that Welch acknowledged that if there was a combination of moisture from under the Building and from

the roof that caused the mold and moisture damage in the walls, he would not be able to distinguish between the two; that SMM's insurance expert concluded that the damage was the result of a combination of water coming from the roof and water coming from under the Building, and testified that moisture coming from under the Building would not have been covered because lack of a moisture barrier was defective construction and because surface water contributed to the non-covered part of the loss; and that SMM's insurance expert also testified that no allocation of what portion of the damage was coming from penetrations in the roof (which he contends are covered) versus what was coming from under the bBuilding, which would not be covered, was ever made.

SMM responds that Welch actually testified that, although improper installation *could* lead to "loose laps" in matelines, with respect to the loose laps he actually observed on the roof, he observed visible "drag marks" damaging the matelines, P. Br. 35; that Welch testified that 80% of the interior damage, specifically down the central corridor of the Building, was exclusively caused by damage to the roof; that Welch was able to segregate the remaining 20% to the exterior walls of the building, which were not damaged from rainwater penetrating external cuts and holes; that Welch even produced a color-coded diagram with his expert report that clearly delineates between the covered and non-covered losses; and that through Welch's testimony, SMM has easily satisfied its burden to produce evidence that will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the Policy.

Travelers replies, *inter alia*, that, even assuming that all of the mold and moisture

damage came from the roof, as SMM alleges, SMM has not segregated between covered and non-covered moisture intrusion from the roof; has not segregated from any other cause the water intrusion from construction-related damage to the roof; and has not pointed to any other cause of the damage to the roof that allegedly allowed water to infiltrate.

C

Under the Texas common law doctrine of concurrent causation, plaintiffs are not required "to establish the amount of covered loss with absolute mathematical precision." *Fiess v. State Farm Lloyds*, 392 F.3d 802, 808 n.24 (5th Cir. 2004). "Rather, the only requirement that has been propounded with any regularity is that of setting forth some *reasonable basis* for allocating damage between covered and non-covered events." *Id.* In *Fiess*, for example, the panel held that the plaintiff could segregate mold damages from two causes—a covered pipe leak and a non-covered natural flood—because the water level of the covered pipe leak was higher. The jury could therefore reasonably infer "that the mold contamination located above the maximum height reached by the [non-covered] flood waters is attributable to a covered loss." *Id*.

The same is true here. SMM points to damage to the interior central corridor of the Building, which a reasonable jury could find appears to be different from damage to the exterior walls. And because SMM posits that *all* of the damage to the interior central corridor was caused when rainwater penetrated external cuts and holes in the roof that were unrelated to the quality or process of constructing the roof of the Building, Travelers is not entitled to summary judgment on the basis that SMM has failed to segregate its covered

losses.[15]

## VIII

The court now turns to Travelers' motion for summary judgment on SMM's claims under the Texas Insurance Code.

## A

The court begins with its SMM's claim that Travelers violated Tex. Ins. Code Ann. § 541.060(a)(7). Section 541.060(a)(7) of the Texas Insurance Code prohibits an insurer from "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." Tex. Ins. Code Ann. § 541.060(a)(7). Travelers maintains that it is entitled to summary judgment on SMM's § 541.060(a)(7) claim on the basis that its coverage denial was correct, or, alternatively, on the ground that it had a reasonable basis to deny coverage based on the information provided by SMM and Vertex during the claims adjusting process.

SMM responds that a reasonable jury could find that Travelers acted in bad faith based on evidence undermining the First Vertex Report and suggesting a lack of objectivity. SMM cites evidence that Floyd (who worked for Vertex, a third party consulting firm whom Travelers retained) believed that his investigation was "precursory"; thought that a more

---

[15]The court concludes above that, to the extent damage to the Building was caused directly or indirectly by mold, that damage is excluded under Exclusion B.1.b. *See supra* § VI (D). At trial, SMM will be required to segregate damage caused by mold, which the court now holds is excluded under the Policy, from damage caused by a Covered Cause of Loss. Because Travelers does not move for summary judgment on the basis that SMM has failed to segregate damage caused by mold from damage caused by water, the court does not consider whether this "failure to segregate covered and noncovered perils is fatal to recovery." *Comsys Info. Tech. Servs., Inc.*, 130 S.W.3d at 198.

thorough investigation would follow; was surprised to learn that there was no subsequent investigation; did not draft the conclusions in the First Vertex Report; and disagreed with the accuracy of the statement that "Vertex did not observe evidence indicating that the reported excessive moisture and microbial growth was attributable to roof leaks," P. Br. 39 (citing P. App. (ECF No. 70-1) at 113). SMM also relies on evidence that Stephen S. Collins, SMM's retained expert on claims handling practices, testified that the VeriClaim photographs clearly conflicted with the First Vertex Report and that McClure should have tried to resolve the conflict before denying coverage; that Travelers' claim notes indicate that, even before Vertex was retained to investigate the loss, Travelers had predetermined that it would deny coverage; and that the evidence shows that McClure influenced the wording of the First Vertex Report, including the observation that there was no evidence that the moisture intrusion in the Building was attributable to roof leaks.

Travelers replies that the question whether it was reasonable for Travelers to rely on the First Veritex Report is not relevant to the summary judgment analysis. This is so, Travelers maintains, because the basis for Travelers' motion is that SMM cannot establish bad faith, which is a requirement for a § 541.060(a)(7) claim, given that there was a bona fide dispute about coverage, regardless of the alleged cause of the water infiltration.

## B

"Texas courts have clearly ruled that . . . extra-contractual tort claims [brought under the Texas Insurance Code] require the same predicate for recovery as bad faith causes of action in Texas." *Hall Arts Ctr. Office, LLC v. Hanover Ins. Co.*, 327 F.Supp.3d 979, 999

(N.D. Tex. 2018) (Fitzwater, J.) (citing *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997)).  But "[e]vidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994).  "[A]n insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denial of that coverage." *Higginbotham*, 103 F.3d at 460 (citing *Emmert v. Progressive Cnty. Mut. Ins. Co.*, 882 S.W.2d 32, 36 (Tex. App. 1994, writ denied)); *see also id.* at 459 ("As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." (citing *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 600 (Tex. 1993))). "However, relying solely on an expert's report will not shield the insurer from bad faith liability 'if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable.'" *Torres v. Lloyd's of London Syndicate No. 4242*, 2011 WL 6257144, at *7 (S.D. Tex. Dec. 14, 2011) (quoting *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997)).  In determining the reasonableness of an insurer's decision, a court reviews the facts that were available to the insurer at the time of denial. *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990).

C

A reasonable jury could find that it was unreasonable for Travelers to rely on the First Vertex Report to initially deny SMM's claim, given the presence of conflicting evidence

regarding the cause of the moisture intrusion in the Building.[16]  For example,[17] VeriClaim's

photographic evidence shows the extensive patchwork repair on the Building's roof.  Based

on this photographic evidence, a reasonable jury could find that Travelers' reliance on the

First Vertex Report—which concluded that Vertex "did not observe evidence indicating that

the reported excessive moisture and microbial growth was attributable to roof leaks," D. App.

(ECF No. 66-1) at 394—was unreasonable.  Accordingly, because there is a genuine issue

of material fact on the question whether Travelers conducted a reasonable investigation, the

court declines to dismiss SMM's § 541.060(a)(7) claim at the summary judgment stage.

### D

Travelers also moves for summary judgment as to SMM's claim for violation of Tex.

Ins. Code Ann. § 541.061, contending that there is no evidence that Travelers made a

misrepresentation about the Policy.  *See Tex. Mut. Ins. Co. v. Morris*, 383 S.W.3d 146, 150

---

[16]SMM disagrees with the conclusions in the First Vertex Report, arguing, *inter alia*, that McClure (the Travelers adjuster assigned to SMM's claim) influenced the wording of the First Vertex Report and that "one of the edits [McClure made to the report] clearly involved Vertex's supposed observation (or lack thereof) of evidence that the moisture intrusion in the [Building] was attributable to roof leaks." P. Br. 39.  But the summary judgment evidence does not support SMM's allegation. William Dery ("Dery"), the architect of record for the assignment, testified at his deposition that he did not recall what edits had been made to the First Vertex Report before or after his conversation with McClure.  And SMM's citation to the entire redline version of the First Vertex Report is insufficient to permit a reasonable jury to find that any specific change in the First Vertex Report is attributable to McClure.

[17]As stated above, *see supra* note 8, "[w]hen this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact."  *Valcho*, 658 F.Supp.2d at 812 n.8 (citing *Swicegood*, 2003 WL 22234928, at *17 n.25).

(Tex. 2012) (holding that misrepresentation must be about what policy says or what policy covers to recover under § 541.061). SMM has not responded to this ground of Travelers' motion.

Although SMM's failure to respond does not permit the court to enter a "default" summary judgment on this claim, *see, e.g.*, *Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.), "[a] summary judgment nonmovant who does not respond to the motion is relegated to [its] unsworn pleadings, which do not constitute summary judgment evidence," *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)). Moreover,

> [i]f a party fails . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion; [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2), (3). Because SMM has not responded to Travelers' motion for summary judgment with specific evidence to support its claim under Tex. Ins. Code Ann. § 541.061, the court grants Travelers' motion and dismisses this claim.

IX

The court next turns to SMM's claims for fraud and negligent misrepresentation based on the statement in the First Vertex Report ("Alleged Misrepresentation") that "VERTEX did not observe evidence that the excessive moisture and microbial growth was attributable

to roof leaks." P. Br. 41 (bold font omitted) (quoting D. App. (ECF No. 66-1) at 394).[18]

A

The elements of common law fraud in Texas are:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Choe v. Bank of Am., N.A.*, 2013 WL 3196571, at *5-6 (N.D. Tex. June 25, 2013) (Fitzwater, C.J.) (quoting *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004)).

The elements of a claim for negligent misrepresentation are:

> (1) the defendant made a representation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation.

*TIB—The Indep. BankersBank v. Canyon Cmty. Bank*, 2014 WL 145284, at *5 (N.D. Tex. Jan. 15, 2014) (Fitzwater, C.J.) (citing *Hurd v. BAC Home Loans Servicing, LP*, 880 F.Supp.2d 747, 762 (N.D. Tex. 2012) (Lynn, J.)).

Travelers moves for summary judgment on SMM's fraud and negligent misrepresentation claims on the following grounds: (1) the Alleged Misrepresentation cannot

---

[18]To the extent Travelers seeks summary judgment as to any alleged misrepresentation *other than* the quoted statement from the First Vertex Report, *see* D. Br. 32 (setting forth six possible alleged misstatements), the court grants Travelers' motion based on SMM's failure to raise a genuine issue of material fact with respect to these statements.

be attributed to Travelers; (2) the Alleged Misrepresentation is a statement of opinion, not fact; (3) the Alleged Misrepresentation was not false; and (4) SMM did not actually, reasonably, or justifiably rely on the Alleged Misrepresentation.

B

To the extent that SMM bases its fraud and negligent misrepresentation claims on the statement in the First Vertex Report that "VERTEX did not observe evidence indicating that the reported excessive moisture and microbial growth was attributable to roof leaks," D. App. (ECF No. 66-1) at 394, SMM has failed to produce sufficient evidence to enable a reasonable jury to find that Travelers—the only named defendant in this lawsuit—made the Alleged Misstatement.  SMM contends that William Dery ("Dery"), the architect of record for the Vertex assignment, "refused to deny that Adam McClure influenced the drafting of the First Vertex Report," and "could not foreclose the possibility that the edits to this statement were made after he spoke with McClure."  P. Br. 41.  But the testimony that SMM cites does not actually support these contentions.  Dery in fact testified that "the substance of [Vertex's] findings *is not influenced*."  P. App. (ECF No. 70-1) at 239 (emphasis added).  He explained that

> McClure can ask us to give him the cause of certain conditions. And to the extent that we are responding to looking at those causes of that—of the conditions that we're being asked to and not other conditions, then we are fulfilling the scope of our client, but *we are not being influenced on what we put in our report*.

*Id.* at 241 (emphasis added).  Regarding the redline version of the Alleged Misstatement,

- 43 -

Dery testified at his deposition that he *did not know* what edits to the First Vertex Report had been made before or after his conversation with McClure. SMM's reliance on the redline version of the Alleged Misstatement is therefore alone insufficient to permit a reasonable jury to find that any specific change was attributable to McClure rather than to Vertex.

C

SMM has also failed to raise a genuine issue of material fact with respect to its fraud and negligent misrepresentation claims under an agency theory of liability. In its amended complaint, SMM alleges that "Vertex, as Travelers' agent, represented to SMM that, among other things, Vertex's professionals had not observed any evidence of roof leaks in the building." Am. Compl. ¶ 6. "Generally in Texas, the doctrine of vicarious liability, or respondeat superior, makes a principal liable for the conduct of his employee or agent." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 686 (Tex. 2007) (citing *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998)). But under Texas law, a misrepresentation made through an intermediary is only actionable "if it is intended to influence a third person's conduct." *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001); *see also Hall v. Douglas*, 380 S.W.3d 860, 869 (Tex. App. 2012, no pet.) ("A person making a representation is only accountable for its truth to the person he seeks to influence and no one else has a right to rely on the representation or make a claim based upon its alleged falsity." (citation omitted)).

Travelers maintains that the First Vertex Report was made only to assist and influence Travelers, not SMM. SMM has not responded to Travelers' argument or produced any

evidence that would enable a reasonable jury to find that Vertex intended SMM to act on the First Vertex Report. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 578. Accordingly, because SMM has not produced evidence that would enable a reasonable jury to find that Vertex made any misrepresentation to SMM, and because SMM has failed to adduce any evidence that Vertex intended that the First Vertex Report influence SMM's conduct, Travelers is entitled to summary judgment dismissing SMM's fraud and negligent misrepresentation claims to the extent they are based on statements made by Vertex, as Travelers' agent.

D

To the extent that SMM bases its fraud and fraudulent misrepresentation claims on the statement in Travelers' June 14, 2018 denial letter—i.e., that "VERTEX did not observe evidence indicating that the reported excessive moisture and microbial growth was attributable to roof leaks," P. App. (ECF No. 70-1) at 175—the court grants Travelers' motion for summary judgment. A reasonable jury could not find that the quoted statement, when considered in context, is a false representation of material fact; instead the jury could only reasonably find that the statement recounts the findings and conclusions set out in the First Vertex Report.

The denial letter states, in pertinent part:

> To help in our investigation, VERTEX Companies, Inc. was retained to inspect the [Building] as well as review the project scope and other pertinent project documents. On December 6, 2017, VERTEX inspected the exterior, interior, roof, and crawl space of the modular building. . . . After a thorough review of your damages and the loss facts, VERTEX concluded that the deficient site grading was the primary cause of the reported

- 45 -

excessive moisture and the microbial growth at the interior of the building.   A secondary factor that contributed to the excessive moisture and microbial growth at the interior was the lack of ventilation in the building's wood-panel siding (skirting) that enclosed the crawl space.

Additionally, *VERTEX has made the following observations*, but not limited to: . . . VERTEX did not observe evidence indicating that the reported excessive moisture and microbial growth was attributable to roof leaks.

P. App. (ECF No. 70-1) at 174-75 (emphasis added).  In the context of Travelers' denial letter, the alleged misstatement is true.  It is undisputed that Vertex *did*, in fact, make the observation in the First Vertex Report that it "did not observe evidence indicating that the reported excessive moisture and microbial growth was attributable to roof leaks."  *See* D. App. (ECF No. 66-1) at 394.  As Travelers contends, the repeated statement is merely "a statement about what Vertex observed during its December 2017 inspection and the conclusions it reached based on those observations."  D. Br. 38.  "Given that Travelers accurately stated what Vertex concluded in its report, nothing about this statement by Travelers was a false statement of material fact."  D. Reply 14-15.  Because a reasonable jury could not find that the statement in Travelers' June 2018 denial letter was false, Travelers is entitled to summary judgment dismissing SMM's fraud and negligent misrepresentation claims to the extent they are based on this statement.

X

Finally, the court turns to SMM's "fraudulent concealment" claim, which the court treats as a claim for fraud by non-disclosure.[19]  This claim is based on the allegation that Vertex and Travelers concealed from SMM and failed to disclose the existence of evidence that leaks in the roof of the Building were the cause of the water loss and that Vertex had not actually ruled out other possible causes of the loss.

A

"Fraud by non-disclosure, a subcategory of fraud, occurs when a party has a duty to disclose certain information and fails to disclose it."  *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).  The elements of a claim for fraud by non-disclosure are:

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.

*Id.* at 219-20 (citing cases).

---

[19]SMM's alleges in count 5 of its amended complaint a claim for "Fraudulent Concealment."  Am. Compl. at 14.  "Fraudulent concealment," however "is a defense to the statute of limitations."  *Stabilis Fund II, LLC v. Compass Bank*, 2020 WL 487497, at *6 n.2 (N.D. Tex. Jan. 30, 2020) (Boyle, J.) (citing *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011)).  The court assumes that SMM intends to bring a claim for fraud by non-disclosure.

Travelers moves for summary judgment on this claim.  It first contends that there is no evidence that Travelers knew and deliberately failed to disclose material facts.  In support, it posits that the First Vertex Report, which Travelers provided to SMM, "fully set forth the basis of all information that was available and the analysis completed by Vertex, including its conclusions opining that the excessive moisture and mold growth was not attributable to roof leaks and instead was attributable to deficient site grading and other issues that allowed moisture to penetrate from under the building," D. Br. 46; that Vertex, and by extension Travelers, did not conceal anything; that there is no evidence that Travelers was aware as of the time of the disclosure of the First Vertex Report that there were any "issues" with the Vertex Report; that the first time anyone raised a concern regarding the First Vertex Report was in April 2019, when SMM provided "new information" to Travelers, including the ERA Reports, and Travelers was asked to reconsider its coverage position; and that when Vertex issued the Supplemental Vertex Report to Travelers, Travelers disclosed the supplemental report to SMM.  Travelers next maintains that SMM cannot establish that it was ignorant of the facts and did not have an equal opportunity to discover them because SMM was in fact aware of *more* information than Vertex, including, *inter alia*, the conclusions of its site superintendent; the Second ERA Report indicating that the moisture was coming from the roof; descriptions of the rain event on October 23, 2017 with water ponding on the floor of the Building, which was inconsistent with moisture intrusion coming from under the building; and AECOM's March 2018 letter blaming the water intrusion on roof issues.  Finally, SMM contends that SMM did not actually, reasonably, or justifiably rely on Vertex's

- 48 -

alleged failure to disclose that there was some evidence that leaks in the roof were the cause of the water intrusion and that Vertex had not ruled out all causes of the water intrusion including leaks from the roof because, *inter alia*, it would not have been reasonable or justifiable to rely on the alleged non-disclosure given that SMM had statements from its site superintendent and the Second ERA Report concluding that the moisture came from the roof.

SMM responds that Travelers did not originally provide Mackie with the VeriClaim photographs when Mackie gave SMM the First Vertex Report, and it [McClure] encouraged Mackie to pursue claims against AECOM; that these photographs were not in SMM's possession when McClure told Mackie that Travelers was denying SMM's claim; that when McClure finally provided SMM with the VeriClaim photographs, Mackie did not understand their significance because Lee did not possess impressive forensic credentials like Sam Reed at Vertex; that when McClure provided Mackie with the photographs, he did not inform Mackie that the photographs undermined the conclusions in the First Vertex Report; that Mackie clearly did not understand the import of the photographs because he only included the Vertex Report in his demand letter to AECOM; and that "[t]here exists genuine issues of fact regarding whether McClure deliberately withheld the photographs to induce SMM to pursue AECOM, and SMM's fraudulent concealment claim should proceed to trial." P. Br. 46.

## B

In its summary judgment response, SMM has narrowed its fraudulent non-disclosure claim to the allegation that Travelers deliberately withheld the VeriClaim photographs from

SMM when it provided SMM with the First Vertex Report.  Assuming *arguendo* that SMM could establish that the two-week delay in providing SMM with the VeriClaim photographs was intentional, and not merely an oversight on Travelers' part, SMM's claim nevertheless fails.

As a preliminary matter, SMM has failed to produce evidence that is sufficient to enable a reasonable jury to find that Travelers failed to disclose a fact about the Building roof that SMM did not have an equal opportunity to discover.  *See Bradford v. Vento*, 48 S.W.3d 749 (Tex. 2001) (reversing jury verdict for plaintiff on fraudulent non-disclosure claim where there was no evidence that defendant knew plaintiff was ignorant of a material fact or that plaintiff did not have an equal opportunity to discover the truth).  SMM has failed to point to any fact contained with the VeriClaim photographs that it did not already know or have equal access to at the time it received the First Vertex Report.  On the contrary, the evidence would only enable a reasonable jury to find that Welch (SMM's site superintendent) was on site by early September and observed holes, screws, and scratches on the roof when he inspected it; that Welch reached the conclusion, in November of 2017, that the water intrusion was coming from the roof, and expressed this opinion to Mackie; and that SMM had access to billing records and photographs from MRC documenting repairs that had been made to the roof in September 2017.

Moreover, SMM has failed to come forward with any proof that it justifiably relied, to its detriment, on Travelers' non-disclosure of the VeriClaim photographs.  It is undisputed that the VeriClaim photographs were provided to SMM on January 5, 2018.  SMM has failed

to point to any evidence of an action that it took, or an injury that it suffered, between its receipt of the First Vertex Report (sometime after December 20, 2017) and when it received the VeriClaim photographs on January 5, 2018.

Accordingly, because SMM has failed to create a genuine issue of material fact at least with respect to these two elements, the court grants Travelers' motion for summary judgment dismissing SMM's claim for fraudulent non-disclosure.

*   *   *

Accordingly, for the reasons explained, the court grants in part and denies in part Travelers' motion for summary judgment.

**SO ORDERED**.

June 14, 2022.

SIDNEY A. FITZWATER
SENIOR JUDGE